******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT v. THOMAS S.*
(AC 45104)

Prescott, Clark and Bear, Js.**

*Syllabus*

Convicted, after a jury trial, of criminal violation of a protective order and
of being a persistent serious felony offender, the defendant appealed
to this court. The trial court issued the protective order prohibiting the
defendant from contacting P, an individual with whom he had previously
been in a relationship, following his arrest on various charges for inci-
dents involving P. The protective order specifically prevented the defen-
dant from contacting P's home or her workplace, which was a liquor
store that she owned. The order did, however, permit the defendant to
return to P's home one time, with a police escort, to retrieve his belong-
ings. P moved the defendant's belongings to the liquor store and instead
attempted to arrange for one of the defendant's family members to pick
them up. Thereafter, the defendant contacted the local police department
and requested a police escort to accompany him to the liquor store so
that he could retrieve his belongings. The defendant arrived at the liquor
store prior to the police escort. He entered the store and immediately
turned off a security camera. He then took money out of the register,
cigarettes from behind the register, and tools from a back room. He
also took bottles of alcohol off the shelves and placed them into multiple
bins. P was not at the store at this time and the defendant told R, P's
employee, not to contact her or to try and stop him from removing the
items he had collected. When the police escort arrived, the officer helped
the defendant load the items into the vehicle in which the defendant
had arrived, unaware that there was a criminal protective order in place.
The defendant then left the liquor store. Shortly thereafter, P arrived at
the store and was greeted by the police officer, who testified that P
appeared to be angry and there was fear in her face and in her voice.
P became very upset after entering the store and discovering the items
that had been taken. She informed the police officer that everything that
the defendant had taken, other than the box of his personal belongings,
belonged to her. The police officer then called the defendant and
instructed him to have a third party return the items to the liquor store.
With the exception of one bottle of alcohol and a few packs of cigarettes,
the items were returned. *Held* that there was sufficient evidence from
which the jury reasonably could have found beyond a reasonable doubt
that the defendant was guilty of violating the protective order: although
the effective information charged the defendant with only one count of
criminal violation of a protective order and the evidence presented at
trial supported multiple, separate incidents of conduct in violation of
the protective order, this court was not required to address whether a
unanimity issue existed because the defendant did not raise such a claim
at trial or in his appellate brief, nor did he ask this court to review
the unpreserved claim pursuant to *State* v. *Golding* (213 Conn. 233);
moreover, contrary to the defendant's argument that he had complied
with the protective order and did not voluntarily go to the liquor store
because he necessarily had to go there to retrieve his belongings, there
was sufficient evidence from which the jury reasonably could have
found that the defendant was guilty of violating the protective order
because he deliberately went to P's workplace, as criminal violation of
a protective order is a general intent crime, and, accordingly, it was not
necessary for the state to prove that the defendant knew that his conduct
violated the protective order or to disprove his alleged subjective belief
that his conduct did not violate the protective order; furthermore, there
was sufficient evidence from which the jury reasonably could have
found that the defendant was guilty of violating the protective order
because he deliberately had contact with R in a manner likely to cause
annoyance or alarm to P, as the jury reasonably could have found that
the defendant, while in the presence of R, took items from the liquor
store after turning off the store's security camera and, in a confronta-
tional manner, warned R not to call P, contact that could cause P to fear

that the defendant would continue to act in an angry and confrontational manner toward her and others associated with her.

Argued September 7—officially released October 31, 2023

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of criminal violation of a protective order and larceny in the sixth degree, and, in the second part, with being a persistent serious felony offender, brought to the Superior Court in the judicial district of Danbury, geographical area number three, where the first part of the information was tried to the jury before *D'Andrea, J.*; verdict of guilty of criminal violation of a protective order; thereafter, the court, *D'Andrea, J.*, declared a mistrial as to the charge of larceny in the sixth degree, and the state entered a nolle prosequi as to that charge; subsequently, the second part of the information was tried to the jury before *D'Andrea, J.*; verdict of guilty; thereafter, the court, *D'Andrea, J.*, rendered judgment in accordance with the verdicts, from which the defendant appealed to this court. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, assistant state's attorney, with whom, on the brief, were *David R. Applegate*, state's attorney, and *Kristin Chiriatti*, assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Thomas S., appeals from the judgment of conviction, rendered following a jury trial, of criminal violation of a protective order in violation of General Statutes § 53a-223.[1] On appeal, the defendant claims that the evidence was insufficient to prove beyond a reasonable doubt that he had the requisite intent to violate the protective order. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are pertinent to this appeal. On January 28, 2019, the trial court issued a criminal protective order identifying P, a person formally romantically involved with the defendant, as the protected person and the defendant as the respondent. The protective order instructed the defendant to "not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person"; to "[s]tay away from the home of the protected person and wherever the protected person shall reside"; and to "not contact the protected person in any manner, including by written, electronic or telephone contact, and [to] not contact the protected person's home, workplace or others with whom the contact would be likely to cause annoyance or alarm to the protected person." Additionally, the order permitted the defendant to "return to [P's] home one time with police to retrieve [his] belongings."

Prior to the issuance of the protective order, the defendant and P lived together in a home owned by P. P worked at a liquor store in Fairfield County (liquor store) that she owned.[2] The relationship between the defendant and P eventually began to deteriorate. The defendant became abusive toward P, including incidents in which he was verbally abusive, intimidated P, and broke P's belongings. As a result of these incidents, P filed an application for an ex parte restraining order against the defendant in family court, which was granted on January 25, 2019.

The defendant subsequently was arrested for threatening in the second degree and criminal violation of a restraining order after threatening to kill P following the issuance of the ex parte restraining order. As a result of this arrest, the court issued the criminal protective order now at issue. As previously discussed, although the protective order ordered the defendant to stay away from P's home, it permitted him to visit her home once with a police escort in order to collect his personal belongings. P instead tried to arrange for the defendant's father or sister to pick up the defendant's personal belongings from the liquor store.[3]

On February 5, 2019, at around 4 p.m., the defendant contacted the local police department (department) to arrange for a police escort to accompany him to the liquor store to pick up his personal belongings.[4] Ser-

geant Chris McManus received the dispatch assigning him to escort the defendant into the liquor store. Pursuant to department protocol, he first conducted a records search to determine whether there were any pertinent protective orders issued against the defendant. Although McManus discovered the ex parte civil restraining order through this search, McManus did not discover the criminal protective order against the defendant.[5]

The defendant and a friend drove to the liquor store in a pickup truck. On arrival, rather than wait for the police escort to arrive, the defendant entered the business alone. P was not present at the liquor store when the defendant arrived. R, an employee of the liquor store, observed the defendant turn off the inside security camera immediately after the defendant entered the store. The defendant then proceeded to take money from the cash register, while telling R not to call P and not to try to stop him. Additionally, the defendant took several packs of cigarettes from behind the register and tools from the back room of the store. R felt "nervous," "cornered," "scared," and "panick[ed]," and "froze" upon being confronted by the defendant. The defendant then began to fill several empty bins with bottles of alcohol from the liquor store's shelves. The defendant appeared aggressive and angry as he did so. A man who worked next door entered the liquor store, and R signaled for him to call P and inform her about what was happening.

Shortly thereafter, McManus arrived at the liquor store. After McManus entered the liquor store, the defendant began to load his personal belongings, the bins containing the bottles of alcohol,[6] the packs of cigarettes and the tools taken from the back room of the liquor store into the pickup truck. Both R and McManus aided the defendant in loading the truck.[7] R then received a call from P, who told him that she was on her way back to the store. When McManus learned that P was on her way back to the liquor store, he instructed the defendant to finish loading the items quickly and leave before P returned.

After the defendant left the liquor store parking lot, P arrived. When McManus greeted P in her car upon her arrival, she appeared very "angry," "upset," "annoyed," and "alarmed," and "there was fear in her face and in her voice." P then entered the store and, after seeing what had been taken, dropped to her knees crying. Because R appeared "shaken" and "traumatized" to P, she sent him home. After assessing the store's inventory and confirming what the defendant had taken, P informed McManus that everything that the defendant had taken, except the box of his personal belongings, belonged to her.

McManus called the defendant to direct him to return the items he had taken. McManus eventually was able

to arrange for the return of most of the items taken, except for a partially empty bottle of alcohol and several packs of cigarettes. At McManus' direction, a third party, the driver of the pickup truck, rather than the defendant, returned the remaining items to the liquor store.

The defendant was arrested and charged with larceny in the sixth degree on March 7, 2019. After the defendant's arrest, the state filed several substitute informations adding the additional charges of burglary in the third degree, criminal trespass in the second degree, and criminal violation of a protective order.[8] The trial began on February 11, 2020. At trial, the state argued that the defendant had violated the protective order by deliberately going to P's workplace and by deliberately confronting P's employee in a manner likely to cause annoyance or alarm to P. In response, the defendant, who was self-represented, alleged that he acted with the intent to comply with the protective order. On February 28, 2020, the jury found the defendant guilty of criminal violation of a protective order.[9] On December 3, 2020, the trial court, *D'Andrea, J.*, sentenced the defendant to eight years of incarceration, followed by two years of special parole. This appeal followed.

I

The defendant claims on appeal that his conviction of criminal violation of a protective order must be reversed because the state failed to present sufficient evidence to prove beyond a reasonable doubt that the defendant had the necessary intent to violate the protective order. We are not persuaded.

Before we turn to the defendant's claim, we first address a potential issue resulting from the manner in which the state drafted the operative information. The protective order prohibits the defendant from "contact[ing] the protected person's home, workplace *or* others with whom the contact would be likely to cause annoyance or alarm to the protected person." (Emphasis added.) In the long form information, however, the state charged the defendant with violating the protective order "[b]y going to [P's], the protected person's, workplace *and*, thereat, creat[ing] contact likely to cause annoyance and alarm to said protected person, in violation of . . . § 53a-223." (Emphasis added.)

Although the information charges the defendant with only one count of criminal violation of a protective order in violation of § 53a-223, the evidence presented at trial in this case supports multiple, separate incidents of conduct in violation of the protective order. At trial, the state argued to the jury that the defendant had violated the protective order (1) by going to P's workplace and (2) by contacting another person, R, because such contact with him would be likely to cause annoyance or alarm to P. The court gave the jury the following

instructions: "The defendant is charged with violating the provision [of the protective order] that states, do not contact the protected person's workplace *or* others with whom the contact would be likely to cause annoyance or alarm to the protected person." (Emphasis added.) No specific unanimity instructions were given to the jury.[10]

Our Supreme Court has held that "a single count of an information that charges a defendant with a single statutory violation is duplicitous when evidence at trial supports multiple, separate incidents of conduct, each of which could independently establish a violation of the charged statute." *State* v. *Joseph V.*, 345 Conn. 516, 521, 285 A.3d 1018 (2022), citing *State* v. *Douglas C.*, 345 Conn. 421, 445–47, 285 A.3d 1067 (2022). "In the absence of a specific unanimity instruction to the jury . . . such a count violates a defendant's constitutional right to jury unanimity and requires the reversal of the judgment of conviction if it creates the risk that the defendant's conviction occurred as the result of different jurors concluding that the defendant committed different criminal acts." *State* v. *Joseph V.*, supra, 521.

We need not address whether a unanimity issue exists, however, because the defendant did not raise a unanimity claim at trial[11] or in his appellate brief, nor has he asked us to review such an unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[12] We turn now to the defendant's sufficiency of the evidence claim.

## II

As previously noted, § 53a-223 (a) provides in relevant part that "[a] person is guilty of criminal violation of a protective order when an order . . . has been issued against such person, and such person violates such order." The defendant does not dispute that a protective order had been issued against him. Rather, the defendant claims that the evidence before the jury was insufficient to prove that he had the requisite intent to violate the protective order. With respect to this claim, the defendant makes two arguments. First, the defendant asserts that the state adduced insufficient evidence that the defendant, by going to the liquor store, intended to engage in conduct that violated the protective order. Second, the defendant argues that the state adduced insufficient evidence that the defendant intended to engage in contact likely to cause annoyance or alarm to the protected person. In response, the state argues that there was ample evidence from which the jury reasonably could have found that the defendant was guilty of violating the protective order by (1) deliberately going to P's workplace and (2) deliberately contacting P's employee in a manner likely to cause annoyance or alarm to P. We agree with the state.

We begin our analysis by setting forth the relevant legal principles and standard of review. "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We also note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Additionally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 186–87, 193 A.3d 1 (2018), cert. denied,     U.S.    , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

"[T]he violation of a protective order statute is not a specific intent crime." (Internal quotation marks omitted.) *State* v. *Cheryl J.*, 203 Conn. App. 742, 748, 249 A.3d 742 (2021). Rather, violation of a protective order is a crime requiring proof of general intent. See id. "General intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness. Where a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts." (Internal quotation marks omitted.) *State* v. *Nowacki*, 155 Conn. App. 758, 766, 111

A.3d 911 (2015). "All that is necessary is a general intent that one intend to perform the activities that constitute the violation." (Internal quotation marks omitted.) *State* v. *Cheryl J.*, supra, 748.

A

We first address the defendant's argument that there was insufficient evidence to prove that the defendant intended to engage in conduct that violated the protective order. The defendant argues that the evidence presented at trial showed that he lacked the requisite intent to contact P's workplace. The defendant argues throughout his principal appellate brief and at oral argument before this court that he intended to comply with the protective order by going to P's workplace and that he did not go to P's workplace voluntarily. He argues that he did not voluntarily go to P's workplace because, after P moved his belongings from her home to the store, he was unable to retrieve his belongings any other way. He concludes that, because the protective order permitted him to enter P's home one time, with a police escort, to retrieve his personal belongings and because he necessarily had to go to the liquor store to retrieve his belongings after they were moved, he complied with the protective order and did not voluntarily go to the liquor store.

In this argument, the defendant conflates voluntariness with necessity. In so arguing, the defendant misconstrues what is required to find a violation of the protective order. Criminal violation of a protective order is a general intent, rather than a specific intent, crime. Id. For a general intent crime, an action is voluntary when the actor deliberately, consciously, or purposefully takes that action, regardless of the actor's subjective intent. See *State* v. *Nowacki*, supra, 155 Conn. App. 766. Therefore, the defendant's subjective intent in going to the liquor store and his perceived necessity of this action does not make his otherwise deliberate, conscious, and purposeful act of going to the liquor store involuntary. Moreover, it was not necessary for the state to prove that the defendant knew that his conduct violated the protective order or to disprove the defendant's alleged subjective belief that his conduct did not violate the protective order. *State* v. *Winter*, 117 Conn. App. 493, 508, 979 A.2d 608 (2009), cert. denied, 295 Conn. 922, 991 A.2d 569 (2010). On the basis of our review of the record, we conclude that there was sufficient evidence from which the jury reasonably could have found that the defendant intended to engage in conduct prohibited by the protective order.

The protective order instructed the defendant "[to] not contact the protected person's . . . workplace . . . ." The jury was presented with evidence that the liquor store was P's workplace. The jury also was presented with evidence that the defendant had a friend drive him to the liquor store and that he entered the

liquor store without waiting for the police escort to arrive. Therefore, a reasonable view of the evidence presented at trial supports the inference that the defendant intentionally contacted P's workplace by entering the liquor store, thereby violating the condition of the protective order ordering the defendant not to contact P's workplace. Moreover, the defendant's counsel conceded during oral argument before this court that the defendant intended to go to the liquor store.

Viewing the record in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence from which the jury reasonably could have found beyond a reasonable doubt that the defendant had the intent to enter P's workplace and, therefore, had the requisite general intent to perform an activity in violation of the protective order. The defendant's claim to the contrary fails.

B

We next address the defendant's second sufficiency of the evidence argument, namely, that there was insufficient evidence of his intent to contact others in a manner likely to cause annoyance or alarm to P. He argues that the record reflects that he had the general intent to engage in contact that was either in compliance with the protective order or that was meant to avoid any potential violations of the protective order.[13] Again, the defendant's argument is unavailing.

The protective order prohibited the defendant from contacting others in a manner likely to cause annoyance or alarm to P. The jury reasonably could have found that the defendant took money, bottles of liquor, cigarettes and tools from the liquor store, in R's presence, after turning off the security camera and that the defendant, in a confrontational manner, warned R not to call P.[14] From this, the jury reasonably could have inferred that the defendant intentionally contacted R.

The jury also reasonably could have found from the evidence admitted at trial that the defendant's contact with R was likely to cause annoyance or alarm to P. Although the defendant argues that the evidence shows that he contacted R in a manner likely to *avoid* annoyance or alarm to P, arguing that he turned off the security camera and directed R not to call P in order not to annoy or alarm her, the jury was not required to accept his version of events or draw the inferences he urges this court to adopt. The jury reasonably could have found from the evidence presented that the defendant contacted P's employee, R, at P's liquor store in a confrontational and angry manner as he took money and inventory from the store. Taken cumulatively, particularly in light of the defendant first turning off the security camera, the jury reasonably could have found that the defendant's confrontational contact with P's employee could cause P to fear that the defendant

would continue to act in an angry and confrontational manner toward her and others associated with her. Therefore, the jury reasonably could have found that such contact would be likely to cause P annoyance or alarm.

Additionally, the record reflects that the defendant's contact with R left R feeling "nervous," "cornered," "scared," and "panick[ed]," and that he "froze" upon being confronted by the defendant. The jury reasonably could have found that finding her employee in such a state was likely to cause P annoyance or alarm.

In summary, we conclude that there was sufficient evidence from which the jury reasonably could have found beyond a reasonable doubt that the defendant had the requisite intent to enter the liquor store, interact with P's employee in a confrontational manner and take items, including bottles of liquor, packs of cigarettes and tools, all of which together constitute contact likely to cause annoyance or alarm to P in violation of the protective order. Accordingly, the defendant's sufficiency of the evidence claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 53a-223 (a) provides in relevant part: "A person is guilty of criminal violation of a protective order when an order . . . has been issued against such person, and such person violates such order."

[2] During their relationship, the defendant convinced P to purchase two liquor stores, including the one in Fairfield County. After purchasing the Fairfield County liquor store, P began working there every day and assumed the daily operations of the business.

[3] On appeal, the defendant argues that by moving his belongings from her home to the liquor store, P "modified" the protective order. The defendant's argument amounts to a contention that P consented to him entering her workplace because, by moving his belongings, he was unable to go to P's home to retrieve his belongings with a police escort and instead could retrieve his belongings only by going to P's workplace. We summarily reject this assertion. A criminal protective order is issued by the court following consideration of all of the relevant considerations and does not depend on the consent of the protected person. See, e.g., *State* v. *Riggsbee*, 112 Conn. App. 787, 792 n.2, 963 A.2d 1122 (2009) (noting that criminal protective orders are issued to promote public peace, as well as to protect victim, and that, as such, protective orders are often issued against express wishes of victim). Because it is a court order, the defendant is bound by its terms unless he seeks and obtains relief from it by the court. See *State* v. *Fernando A.*, 294 Conn. 1, 29–31, 981 A.2d 427 (2009) (detailing procedures to challenge necessity for criminal protective order). Thus, a defendant who does not comply with the conditions of a protective order violates the order, even if the violation occurs as a result of the protected person's consent or in accordance with the protected person's wishes. See *State* v. *Winter*, 117 Conn. App. 493, 501, 979 A.2d 608 (2009) ("[a]n order issued by a court of competent jurisdiction must be obeyed by the parties until it is reversed by orderly and proper proceedings" (internal quotation marks omitted)), cert.

denied, 295 Conn. 922, 991 A.2d 569 (2010).

[4] The criminal protective order issued on January 28, 2019, was still in effect on this date.

[5] The record does not reflect the reason why the department did not discover the criminal protective order.

[6] The defendant covered the bins with lids when McManus arrived. McManus was not aware that the covered bins contained alcohol until after the defendant had left the liquor store.

[7] R helped the defendant load the items into the truck because he "didn't want to escalate the situation and make it any . . . worse." McManus "had no reason to think that [he] was being deceived, so [he] gave [the defendant] a hand [loading the items into the truck]"; he would not have helped the defendant if he had known that the items taken did not belong to the defendant.

[8] The state eventually dropped the burglary and trespass charges. The operative information before the jury was filed on February 28, 2020, and charged the defendant with one count of criminal violation of a protective order in violation of § 53a-223, and one count of larceny in the sixth degree in violation of General Statutes § 53a-125b. Additionally, the state charged the defendant with being a persistent serious felony offender in violation of General Statutes § 53a-40 (c), by way of a part B information dated January 16, 2020.

[9] The jury was unable to reach a unanimous verdict on the larceny charge, and, therefore, the trial court, *D'Andrea, J.*, declared a mistrial as to that count. Evidence on the part B information was presented to the same jury on March 3, 2020, and the jury found the defendant guilty of being a persistent serious felony offender in violation of General Statutes § 53a-40 (c).

[10] When instructing the jury, the trial court included only a general unanimity charge: "If you unanimously find that the state has proved beyond a reasonable doubt each of the elements of the crime of criminal violation of a protective order, then you shall find the defendant guilty. On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt any of the elements, you shall find the defendant not guilty."

[11] We note that the decisions in *State* v. *Joseph V.*, supra, 345 Conn. 516, and its companion case, *State* v. *Douglas C.*, supra, 345 Conn. 421, were released after the underlying trial in the present case.

[12] At oral argument before this court, counsel for the defendant stated that "[he had] not addressed a unanimity issue," that the issue of unanimity was "not something that's before the court," and that the defendant had not objected to the jury instructions given by the trial court.

In *State* v. *Golding*, supra, 213 Conn. 239–40, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.)

[13] The defendant argues that his conduct in the liquor store, including taking the tools and the bottles of liquor, was influenced by his mistaken or accidental belief that he had an ownership interest in the items. Again, the defendant's subjective belief in his right to engage in this conduct is immaterial to our inquiry. Rather, we ask whether the defendant intentionally, that is, deliberately, consciously, or purposefully, contacted others with whom the contact would be likely to cause annoyance or alarm to P and whether this contact was likely to cause P annoyance or alarm.

[14] R testified that, when he attempted to call P, the defendant told him, "don't you fucking call [P], [R]."