******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* HEIDI LEUDERS
## (AC 45519)

Cradle, Prescott and DiPentima, Js.

*Syllabus*

Convicted, following a bench trial, of criminal damage of a landlord's property in the first degree, the defendant appealed to this court, claiming that there was insufficient evidence that she intentionally damaged the tangible property of the landlord, R, and that the trial court improperly denied her motion to suppress evidence discovered following a warrantless entry into her residence and statements she made while in police custody. The defendant had entered into a residential lease agreement with R for a single family home. At that time, she was the vice president of a dog rescue company and owned a dog behavioralist company. R was aware of the defendant's businesses and the lease agreement allowed the defendant to keep dogs at the home. One night, the defendant texted R, reporting that the heat to the home was not working and asked R to send someone to repair it. The initial repair person could not fix the heating problem. R asked if she could return with another repair person and the defendant agreed but requested that R not enter the upstairs portion of the home, claiming that the upstairs would be locked and the dogs would be there. When R accompanied another repair person to the home the next day, the doors were unlocked and R went upstairs, observing large amounts of trash, damage to the home, and drug paraphernalia. She called the police, but they did not enter the house that day. She also contacted the defendant, who apologized for the condition of the home and promised to clean it up. R sought permission to enter the house two days later during daylight hours, and the defendant agreed. When R returned to the home, the defendant was not present. R discovered piles of trash everywhere, as well as accumulated feces and urine, and a cage with the skeletal remains of a dog inside. She then left the house and called the police, who arrived promptly to the home. Two police officers and an animal control officer arrived and proceeded to enter the home to ensure no one needed medical attention, because the smell of rotting flesh was emanating from the house. During their time in the home, they found the skeletal remains of five dogs, and, after exiting, they secured the home and notified the detective bureau of the situation. The condition of R's home was so severe that it required a hazmat company to clean the house due to the dogs' remains having rotted in the home. Extensive repairs to the home were required in order for it be habitable again, including, inter alia, the replacement of floors, subfloors, counters, and all appliances, due to the pervasive presence of feces and urine. An arrest warrant was subsequently issued for the defendant for animal cruelty,

and she turned herself in, where she was processed for booking by a police detective, D. After being advised of her rights pursuant to *Miranda* v. *Arizona* (384 U.S. 436), the defendant made comments to D questioning whether she would go to jail or be permitted to own dogs in the future. The defendant was ultimately charged with ten counts of animal cruelty and a single count of criminal damage of a landlord's property. The defendant was acquitted of the charges of animal cruelty, the trial court having found that the state failed to prove beyond a reasonable doubt all the elements of the crime. The court noted that a veterinary pathologist had testified that there was no way to determine how the dogs had died due to their advanced state of decomposition when brought to the laboratory. A detective testified that his investigation revealed that the remains had been in the home for between two and ten months. As to the count of criminal damage to R's property, the court sentenced the defendant to five years of incarceration, execution suspended after fifteen months, and probation for five years with special conditions, which included that she not work with organizations that involve animals and that she complete an animal cruelty prevention program. *Held*:

1. The defendant could not prevail on her claim that there was insufficient evidence that she intentionally damaged the home she was renting to sustain her conviction for criminal damage of a landlord's property in violation of statute (§ 53a-117e), which required a finding of specific intent: on the basis of the totality of the evidence the state produced at trial, and the reasonable inferences drawn from that evidence, the trial court reasonably could have found that the defendant specifically intended to damage R's property and that the damage was not the product of accident or neglect but, rather, was done with specific intent, as the damage was pervasive and severe, due, in large part, to conditions the defendant not only allowed to occur, but left to exist and fester for extended periods of time, and that required the services of a hazmat company to remediate, and it was permissible for the court to infer that the defendant intended the natural consequences of these actions; moreover, the defendant's conduct with respect to the damage, first, by attempting to prevent R from seeing it and, then, by acknowledging the damage and expressing shame and remorse about causing it, demonstrated her consciousness of guilt, which was also indicative of her specific intent.

2. The trial court did not err in denying the defendant's motion to suppress certain evidence obtained as the result of the alleged unlawful and illegal entry into her home and statements she made to the police while in custody:

   a. The trial court did not improperly determine that the warrantless entry into the defendant's residence by the police after R returned to inspect the home was supported by the emergency aid doctrine; although the defendant claimed that there was no evidence of an emergency when

the police entered the home or that whatever emergency had existed had since passed, the court credited the testimony of R and the police officers who entered the home, the police officers having testified that they were concerned that an animal or a person, including the defendant, might have needed immediate assistance inside, and, in light of the circumstances, which included the open door to the home, R's discovery of several dog carcasses, the smell of rotting flesh emanating from the home, uncertainty of the defendant's whereabouts and lack of contact with her, the presence of drug paraphernalia in the home, and evidence of unclaimed packages and a mailbox overflowing with uncollected, unopened mail, it was objectively reasonable for the police officers to believe that an emergency existed when they entered the home.

b. This court declined to review the defendant's unpreserved claim that the statements that she made to D while in police custody were not the result of a knowing and intelligent waiver of her *Miranda* rights and were not voluntary, the record having been inadequate for review of that claim: defense counsel did not argue at the conclusion of the suppression hearing that the defendant failed to knowingly and intelligently waive her *Miranda* rights, instead, counsel argued that the court should suppress her statements because the searches that led to the defendant's arrest were illegal, and the defendant raised for the first time on appeal claims that she was highly emotional, confused, and under the influence of intoxicants, having just been released from a rehabilitation facility; moreover, because defense counsel did not make these arguments to the trial court, the court made no findings regarding waiver, but found only that the defendant had been properly advised of her *Miranda* rights and that the defendant "gave those statements anyway."

c. The defendant could not prevail on her claim that the statements she made to D were not voluntary: there was no evidence of any coercive conduct by D, and the trial court properly credited D's testimony, which was the only testimony about the circumstances surrounding the defendant's statements, that she asked the defendant only basic demographic questions, and, after the defendant had been advised of her *Miranda* rights, the defendant initiated conversation of her own accord and made her statements within that context, and, although the defendant appeared to be tired and sometimes crying, D testified that the defendant did not appear to be intoxicated by alcohol or drugs.

3. The defendant could not prevail on her claim that the trial court violated her right to due process by relying on evidence related to the animal cruelty charges in imposing its sentence without explicitly finding that her conduct with respect to the deaths of the dogs had been proven by a preponderance of evidence: although the court did not explicitly state during sentencing that it found that the defendant's conduct, with respect to the deaths of the dogs, had been proven by a preponderance of the evidence, it was implicit from the court's probation orders and its observations that, even though the court had not found the evidence

proved beyond a reasonable doubt that the defendant was guilty of the animal cruelty charges, it did find that the defendant's conduct with respect to the deaths of the dogs had been proven by at least a preponderance of the evidence; moreover, the evidence regarding the defendant's conduct underlying the acquitted charges had the required minimal indicium of reliability, as many of the facts and circumstances related to the charges of animal cruelty also bore on the offense of criminal damage to a landlord's property, including that there was overwhelming evidence that the deceased dogs had been in the defendant's care, that they had perished two to ten months prior to being discovered in the home from which she ran a dog rescue, and much of the damage to the home, which the defendant was convicted of causing, resulted from the toxins that emanated from the dog's carcasses when they were left to rot; furthermore, the court expressly considered the defendant's actions after the verdict, which included bragging on social media about how she had been found innocent, which the court referenced during sentencing by emphasizing that the defendant had not been found innocent, but was, instead, found not guilty.

Argued November 15, 2023—officially released May 28, 2024

*Procedural History*

Substitute information charging the defendant with ten counts of the crime of cruelty to animals and one count of the crime of criminal damage of a landlord's property in the first degree, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, where the court, *McShane, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the court, *McShane, J.*; judgment of guilty of criminal damage of a landlord's property in the first degree, from which the defendant appealed to this court. *Affirmed.*

*Norman A. Pattis*, with whom, on the brief, was *Kevin M. Smith*, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Felicia Valentino*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, Heidi Leuders, appeals from the judgment of conviction, rendered following a court trial, of criminal damage of a landlord's property in the first degree in violation of General Statutes § 53a-117e.[1] The defendant makes three claims on appeal. First, the defendant claims that there was insufficient evidence that she intentionally damaged the tangible property of her landlord, Celly Roberts (landlord).[2] Second, she claims that the trial court improperly denied her motion to suppress (a) evidence discovered following a warrantless entry into her residence and (b) statements she made to the police following her arrest. Finally, she claims that, at her sentencing, the court violated her federal and state constitutional rights to due process by considering conduct related to the crimes of which she was acquitted. We disagree with each of the defendant's claims and affirm the judgment of conviction.

The following facts, which are either undisputed or reasonably could have been found by the trial court, and procedural history are relevant to this appeal. On or about September 21, 2017, the defendant entered into a residential lease agreement with the landlord for a single family home at 37 Prince Street in Fairfield (home). At that time, the defendant was the vice president of Bully Breed Rescue, a dog rescue company, and

---

[1] General Statutes § 53a-117e provides in relevant part: "(a) A tenant is guilty of criminal damage of a landlord's property in the first degree when, having no reasonable ground to believe that he has a right to do so, he intentionally damages the tangible property of the landlord of the premises in an amount exceeding one thousand five hundred dollars. . . .

(d) Criminal damage of a landlord's property in the first degree is a class D felony."

[2] The defendant also argued in her appellate brief that the state presented insufficient evidence to establish that the damage to her landlord's property exceeded $1500. The defendant's counsel withdrew this claim during oral argument before this court.

she owned a dog behavioralist company. The landlord was aware of the defendant's involvement with dogs, and the lease agreement allowed the defendant to keep dogs, reptiles and a snake at the home. The landlord knew that when the tenancy began on October 1, 2017, the defendant would have four dogs living with her at the home; she subsequently became aware that there was a fifth dog living there, which the landlord "had no problem with."

On Sunday, November 11, 2018, the defendant sent a text message to the landlord, reporting that the heat at the home was not working; she asked the landlord to send someone to repair it. The landlord arranged for an emergency plumber to visit the home that evening. The plumber attempted to repair the problem but could not. The defendant was home at that time.

The landlord spoke with the defendant on the telephone later that evening and asked the defendant if she could come to the home with a heating, ventilation, and air conditioning (HVAC) repair person the following day. The defendant agreed and told the landlord that she would leave the exterior door unlocked. The defendant also asked the landlord not to go into the upstairs portion of the home. She said the door to the upstairs would be locked and the dogs would be there. When the landlord and the HVAC repair person went to the home on the evening of November 12, 2018, the exterior door was unlocked, and the interior doors to both the basement and the upstairs were wide open, as well. The home had an open floor plan, and the landlord was able to see "all the way through" the open door to the upstairs.

The landlord and the HVAC repair person went into the basement when they arrived. There, they discovered water damage that had probably occurred a couple of months prior, and the HVAC repair person could not

fix the heating problem. When they finished in the basement, they went to the first floor level. The landlord observed trash and "devastation" through the open door to the upstairs. She also smelled something burning. Concerned about a fire hazard, she walked into the upstairs area and "unplugged the [electric] heater that was sitting on a pile of trash, with the TV on and the fan blowing." She saw drugs and drug paraphernalia, as well.

The landlord stayed in the upstairs area for only a couple of minutes before she left and called the police, reporting that there "were drugs and paraphernalia and devastation in the house." The police responded immediately but did not enter the home that day.

The landlord also sent a text message to the defendant. She testified that in that message she stated that she was "devastated [by] the condition of [her] home," she asked the defendant how she "could . . . have done that," and she asked the defendant about her drug use. The landlord also told the defendant she would return to the home on Wednesday, November 14, 2018, to see it during the daylight hours.[3] The landlord testified that the defendant responded to her text message and stated she "felt terrible," it was "just surface damage," she would clean up the home and "she was trying to seek help" for her "problem."

When the landlord returned to the home on November 14, 2018, "[t]he house was completely open," and the defendant was not there. The landlord went inside and observed "[a] lot of damage. A lot of trash. A lot of unopened dog food. A lot of food containers, needles.

---

[3] The lease agreement provides in relevant part that "[t]he Landlord shall have the right to enter the Premises during normal working hours by providing at least twenty-four (24) hours notice in order for inspection, [to] make necessary repairs, alterations, or improvements, to supply services as agreed or for any reasonable purpose. . . ."

It was very hard to walk because . . . you couldn't see [the] floor." When the landlord reached the front room, she observed a cage with the skeletal remains of a dog inside. She immediately left, went to a neighbor's home, told him what she had found, and they returned to the home to walk through it together. They discovered more dog carcasses and observed damage throughout the home, including "a lot of teeth marks and scratches in the downstairs bathroom . . . on the baseboards and on the door." They stayed inside for less than five minutes because the "smell was so intense."

When the landlord left the home, she called the police and reported what she had observed.[4] Officers Raymond Quiles and John McGrath and Animal Control Officer Paul Miller, all of the Fairfield Police Department, arrived within minutes. Officer Quiles testified at trial that the house looked run down on the outside and that there was a smell of rotting flesh coming from within.[5] After speaking with the landlord, the three officers entered the home "in case there was anybody in need of assistance inside, or a dead body inside, or anything like that."

The officers were inside the home for between five and fifteen minutes. During that time, they found the remains of five dogs.[6] Officer Miller testified at trial that the dogs were "decomposed almost totally so that they had been there in that situation for a while." The officers also observed "garbage all over the floor" and "a lot of filth." They "established that there was nobody in need of any aid inside, [so they] exited the residence and

---

[4] The landlord reported that she found four dead dogs in the home. It was determined later that there were five.

[5] Officer Quiles testified that he had "responded to several calls where there were dead bodies on scene. It's a very memorable smell."

[6] There were two dog carcasses on the first floor and three dog carcasses on the second floor. Four of the carcasses were inside crates and the fifth was uncrated.

secured it . . . ." They then notified the detective bureau of the Fairfield Police Department about the situation.

Detective Kevin McKeon arrived at the scene shortly thereafter and started an investigation. He and Detective Frederick Caruso applied for and secured a search warrant for the property. Detective McKeon took photographs of the exterior and interior of the home and then he and his colleagues searched for "deceased animals or anything else that stood out." Besides the five dog carcasses, there was "tons of garbage, trash, dog feces. Just piles of garbage" inside the home. There was also a terrarium with the carcass of a dead lizard inside. Several windows were open and there were multiple air fresheners hanging on doorknobs.[7]

The officers tagged, separately bagged and removed the remains of the five deceased dogs from the home in accordance with police department protocol. The remains were taken for testing at the Connecticut Veterinary Medical Diagnostic Laboratory the following day, and the pathologic findings reflected in the November 16, 2018 final laboratory reports indicate that each dog "possibly died from lack of food/water." Detective McKeon's investigation revealed that the remains had been in the home for two to ten months.[8]

After gathering information and conducting interviews, Detective McKeon prepared a warrant for the defendant's arrest, which charged her with five counts

---

[7] Several photographs taken by Detective McKeon were admitted into evidence. Many depict large amounts of garbage and clutter strewn throughout the home. The floors, countertops and furniture were covered with all sorts of debris, including feces. One photograph shows piles of feces completely covering several feet of the living room floor. Exterior photographs depict a front porch cluttered with boxes and unopened packages, and a mailbox overflowing with unopened mail.

[8] Herbert Van Kruiningen, a senior pathologist, testified at trial that when he examined the dogs' remains, they were "decomposed to an extreme level" and that, based upon what was provided to the laboratory to examine, there was no way to know for certain how the dogs died.

of cruelty to animals in violation of General Statutes (Rev. to 2017) § 53-247 (b) (1),[9] and one count of criminal damage of a landlord's property in the first degree in violation of § 53a-117e. On January 15, 2019, the defendant turned herself in on the arrest warrant. The defendant told Detective Kerry Dalling, who processed her booking, that she "had just gotten out of a rehab facility that day . . . . " After reading the defendant her *Miranda*[10] rights and asking her basic demographic questions, Detective Dalling did not question the defendant.

The landlord had the damage to the home assessed and was advised that she should first have a hazmat company come in "because it was so toxic in there because [the dogs] had decayed for [so] long."[11] The walls needed to be "flushed through with chemicals" before the home could be safely inhabited. In addition, the kitchen cabinets, the countertops, and all the appliances were ruined and needed to be replaced, and all of the flooring and subflooring needed to be removed and replaced because the floors had been saturated with feces and urine. The lowest quote the landlord received for hazmat services alone was $25,000. The landlord did not have the funds to make the necessary repairs and she ultimately lost the home to foreclosure.

On November 29, 2021, the state filed an amended substitute information and charged the defendant with five counts of cruelty to animals in violation of § 53-

---

[9] General Statutes (Rev. to 2017) § 53-247 (b) provides in relevant part: "Any person who maliciously and intentionally maims, mutilates, tortures, wounds or kills an animal shall, (1) for a first offense, be guilty of a class D felony . . . ."

All references herein to § 53-247 are to the 2017 revision of the statute.

[10] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[11] On November 16, 2018, a Fairfield Health Department inspector had similarly advised the landlord to hire a "professional cleaner" because of the unsanitary conditions.

247 (b) (1), five counts of cruelty to animals in violation of § 53-247 (a)[12] and one count of criminal damage of a landlord's property in the first degree in violation of § 53-117e. This case was tried to the court, *McShane, J.*, and, on February 9, 2022, it returned its verdict. The court found the defendant not guilty of the ten counts of cruelty to animals and guilty of criminal damage of a landlord's property in the first degree.[13] At the conclusion of the May 4, 2022 sentencing hearing, the court imposed a total effective sentence of five years of imprisonment, execution suspended after fifteen months, and probation, with special conditions, for a period of five years. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

We first address the defendant's claim that there was insufficient evidence to sustain her conviction for crimi-

[12] General Statutes (Rev. to 2017) § 53-247 (a) provides in relevant part: "[A]ny person who . . . tortures, deprives of necessary sustenance, mutilates or cruelly beats or kills or unjustifiably injures any animal, or who, having impounded or confined any animal, fails to give such animal proper care . . . or fails to supply any such animal with wholesome air, food and water . . . or, having charge or custody of any animal, inflicts cruelty upon it or fails to provide it with proper food, drink or . . . abandons it . . . shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both . . . ."

[13] Prior to returning its verdict, the court commented: "I think it's important to point out nobody in . . . any criminal trial . . . is ever found innocent. There's no such finding as innocent. . . . At trial, if the state proves all its elements beyond a reasonable doubt, the verdict is guilty. If the state fails to prove each and every element beyond a reasonable doubt, the fact finder is obligated to come back with a verdict of not guilty." It explained that "[t]o prove the first five counts of animal cruelty, the state must prove beyond a reasonable doubt that the defendant did maliciously and intentionally" kill the dogs but that Dr. Herbert Van Kruiningen testified that he could not tell how the dogs died. With respect to the second five counts of animal cruelty, it explained that the state had the burden to prove that the defendant deprived the dogs of necessary sustenance and stated: "It doesn't matter what I think. It doesn't matter what I suspect. What matters is what the state proved beyond a reasonable doubt."

nal damage of a landlord's property.[14] Specifically, she claims that there was insufficient evidence that she intentionally damaged the home. She argues that the evidence "does nothing to prove that the damage was caused by anything other than accident or neglect." In response, the state argues that the photographic evidence of, and testimonial evidence about, extensive damage to the home, coupled with evidence that demonstrated the defendant's consciousness of guilt, amply supports the conclusion that the defendant intentionally damaged her landlord's property. We agree with the state.

We begin our analysis by setting forth our standard of review and the relevant legal principles. "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We also note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the

---

[14] This is the third issue the defendant presents in her appellate brief. We address this issue first because if she prevails on her sufficiency claim, the defendant would be entitled to a directed judgment of acquittal and it would not be necessary to address her other claims. See *State* v. *Moore*, 100 Conn. App. 122, 126 n.2, 917 A.2d 564 (2007).

fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Additionally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Thomas S.*, 222 Conn. App. 201, 211–12, 304 A.3d 513 (2023), cert. denied, 348 Conn. 943, 307 A.3d 909 (2024).

"[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony . . . and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *Stilkey* v. *Zembko*, 200 Conn. App. 165, 178, 238 A.3d 78 (2020).

"A tenant is guilty of criminal damage of a landlord's property in the first degree when, having no reasonable ground to believe that [she] has a right to do so, [she] intentionally damages the tangible property of the landlord of the premises in an amount exceeding one thousand five hundred dollars . . . ." General Statutes § 53a-117e (a). In *State* v. *Goode*, 208 Conn. App. 198, 262 A.3d 1028 (2021), this court addressed and rejected a defendant's claim that the state had not presented

sufficient evidence to establish the specific intent required to sustain his conviction for violating § 53a-117e (a). In doing so, this court explained that "§ 53a-117e (a) is a specific intent crime, because it requires, inter alia, that a tenant intentionally damage a landlord's property in an amount exceeding $1500. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . [T]he [trier of fact is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available . . . . Intent may be gleaned from circumstantial evidence. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citation omitted; internal quotation marks omitted.) Id., 202–203. Applying these legal principles in *Goode*, this court concluded that testimonial and photographic evidence of substantial damage throughout the landlord's property[15] allowed the fact finder to reasonably infer that the defendant had the specific intent to cause the damage, as did evidence of the defendant's consciousness of guilt after he did so. Id., 203–204.

As in *Goode*, the testimonial and photographic evidence here depicted substantial damage to the home.

---

[15] This evidence included "holes in the sheetrock, shattered mirrored closet doors, broken closet doors, burn marks on a butcher block kitchen countertop, a damaged refrigerator, damage to vanities and kitchen cabinets, a broken railing, garbage throughout the property, mold and water damage, cracked and broken tile flooring, broken towel bars, damaged carpeting, hardwood and trim, and animal feces in most of the rooms of the property." (Footnote omitted.) *State* v. *Goode*, supra, 208 Conn. App. 203.

See id., 203. The damage was extensive and so extreme that the landlord was advised that to remediate it, she would first need to employ a hazmat company to address dangerously unsanitary conditions, which included toxins from the remains of the five dogs that had been left to decay in the home for two to ten months, as well as the accumulated feces and urine. The stench was so strong that it could be smelled from the outside, making it difficult to stay inside for longer than a few minutes, and the walls needed to be "flushed through with chemicals" and sanitized before anyone could safely live there again. The lowest quote the landlord received for these services was $25,000.

The physical damage to the home also included "teeth marks and scratches" on baseboards and doors, and water damage in the basement that had existed for months. There was garbage and feces throughout the home, which made it difficult to walk. In fact, there were areas where piles of feces had accumulated and were fully covering several feet of the floor. All the flooring and subflooring had to be removed and replaced because the floors had been saturated with feces and urine, and the kitchen cabinets, the countertops, and all the appliances were ruined and had to be replaced.

In addition, the defendant's conduct after damaging her landlord's property indicated her consciousness of guilt. When the defendant had no choice but to allow the landlord access to the home because the heat was not working, she asked the landlord to stay out of the upstairs area where the extent and severity of the damage was most evident. When the landlord confronted the defendant on November 12, 2018, by text message, about the condition of the home, the defendant acknowledged the damage, replied that she "felt terrible" about it and told the landlord that she would clean it up. When the landlord returned two days later, however,

the defendant was not there, and the home had not been cleaned. Several windows had been left open and there were multiple air fresheners hanging on doorknobs. When the defendant turned herself in on the arrest warrant, she told Detective Dalling that "she [couldn't] believe she did this" and that "she was a terrible person."

On the basis of this evidence, the court reasonably could have inferred that the damage the defendant caused to the home was not the product of accident or neglect but, rather, was done with a specific intent. See *State* v. *Goode*, supra, 208 Conn. App. 203–204. The damage was pervasive and severe, due, in large part, to conditions the defendant not only allowed to occur, but left to exist and fester for extended periods of time. It was permissible, therefore, for the court to infer that the defendant intended the natural consequences of these actions. See *State* v. *Pjura*, 200 Conn. App. 802, 808–809, 240 A.3d 772, cert. denied, 335 Conn. 977, 241 A.3d 131 (2020). Likewise, the defendant's conduct with respect to the damage, first by attempting to prevent the landlord from seeing it, and then by acknowledging the damage and expressing shame and remorse about causing it, demonstrates her consciousness of guilt, which is also indicative of her specific intent. See *State* v. *Goode*, supra, 208 Conn. App. 204; see also *State* v. *Richards*, 196 Conn. App. 387, 403, 229 A.3d 1157 (2020) (fact finder may use consciousness of guilt evidence to draw inference of intent to commit criminal offense), aff'd, 339 Conn. 628, 261 A.3d 1165 (2021).

On the basis of the totality of the evidence the state produced at trial, and the reasonable inferences drawn from that evidence, the court reasonably could have found that the defendant specifically intended to damage her landlord's property. We therefore conclude that the defendant's sufficiency claim is without merit.

## II

The defendant next claims that the court improperly denied her motion to suppress certain evidence obtained as a result of "an unlawful and illegal entry and search" of her home and the statements she made to the police while in their custody. Specifically, she argues that the court improperly (1) determined that the November 14, 2018 warrantless entry into her home was justified under the emergency aid doctrine, which is an exception to the warrant requirement[16] and (2) admitted into evidence at trial statements she made while in police custody because she had not knowingly and intelligently waived her *Miranda* rights[17] and

[16] In her appellate brief, the defendant refers to "four illegal searches," three of which allegedly were conducted by the landlord prior to the entry by the police on November 14, 2018, and she claims that "[t]he three initial searches by [the landlord], and subsequent searches by law enforcement, were conducted in violation of the fourth amendment and unjustifiable under the emergency doctrine." It is well settled, however, that "[f]ourth amendment constitutional guarantees against unreasonable searches and seizures apply . . . only to governmental action and do not apply to action by private citizens acting in their private capacity. . . . [A] wrongful search or seizure conducted by a private party does not violate the [f]ourth [a]mendment and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully. . . . An exception, however, to the general rule that the fourth amendment does not protect against searches by private persons is that the fourth amendment may be invoked where a private person, in light of all circumstances of the case, is acting as the agent or instrument of the state." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 40 Conn. App. 789, 792–93, 673 A.2d 1149, cert. denied, 237 Conn. 915, 675 A.2d 886, cert. denied, 519 U.S. 873, 117 S. Ct. 191, 136 L. Ed. 2d 128 (1996).

There is no dispute that the landlord was a private citizen. Moreover, the trial court found that the landlord was not being used as an agent of the police when she entered the home on the occasions preceding the entry by the police, and the defendant does not challenge that finding on appeal. We conclude, therefore, that the fourth amendment does not apply to the entries by the landlord, and we confine our review of this argument to the single warrantless entry by the police on November 14, 2018.

[17] Pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prior to a custodial interrogation a criminal suspect must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

because the statements were not voluntary. We disagree with both of the defendant's arguments and therefore reject this claim.

The following procedural history is relevant to the defendant's claims. On November 2, 2021, the defendant filed a motion to suppress evidence and to dismiss all charges. Therein, she claimed that "any and all" evidence seized or related to "an unlawful and illegal entry and search"[18] of her home on November 14, 2018, and statements she made while in police custody "upon being subject to questioning without being informed of her rights pursuant to *Miranda*," should be suppressed. Prior to the start of trial, the court held a hearing on the defendant's motion to suppress. The landlord and six members of the Fairfield Police Department testified at the hearing and four exhibits were admitted into evidence. The following evidence was adduced.

The landlord and the defendant exchanged several text messages on November 11, 2018, because the heat in the home had not been working for at least two days. The landlord was concerned that the defendant had been living in the home without heat and the defendant responded that "it wasn't that cold in there. Until today." The defendant met with a plumber at the home that evening, but he could not fix the problem. On November 12, 2018, the defendant sent the landlord a text message advising that she left the side door unlocked and that the "[HVAC repair person] can go in the basement. Just tell him not to go upstairs, I have a dog loose." The landlord knew the defendant ran a dog rescue from the home.

When the landlord went with the HVAC repair person to the home on November 12, 2018, there was garbage

---

[18] The defendant relied upon her right to be free from unreasonable searches and seizures as guaranteed by the fourth, fifth, sixth and fourteenth amendments to the United States constitution and article first, §§ 7, 8 and 9, of the Connecticut constitution in support of this claim.

everywhere and her property was "destroyed." She testified that "[i]t was so disgusting [inside], the smell alone you couldn't even be in there for more than two minutes." She called the police, and Officer Michael Komm responded, but he did not enter the home. The landlord also sent the defendant a text message indicating that she would return to the home on November 14, 2018, and the defendant agreed. The door was open when the landlord arrived on November 14, and, shortly after she entered the home, she found the remains of a dog. She left, returned with a neighbor and together they discovered four additional dog carcasses. The landlord called the police.

Officer Quiles was first to respond to the landlord's November 14, 2018 call, and he met with the landlord when he arrived. She told him there was an extreme amount of garbage, filth, drug paraphernalia, and a few dog carcasses inside. The defendant was not present and, according to Officer Quiles' report, the landlord told him that the defendant had not been staying at the home for one week. He knew the landlord and the defendant had been in recent contact, and that the defendant would not tell the landlord where she was staying.[19]

Officer Quiles described the "smell of rotting flesh coming from within the building" and testified that that is why they entered the home. They also knew there were dead dogs inside the home which, according to Officer Miller's testimony, indicated that "something is wrong, [and that] you have to look at what else is wrong . . . ." Officer Quiles testified that they went in to "make sure that there was nobody inside who is either

---

[19] The landlord testified that the defendant had been living at the home at least until November 12, 2018, and that the defendant mentioned that she was at a hotel at some point after that. The landlord also testified that she had been speaking with the defendant on November 11 and 12, 2018, and the defendant stopped responding at some point after that.

dying [or] dead . . . .” Officer McGrath testified that they went in to check for “anyone in need of medical assistance . . . .” Officer Miller testified that they were “going . . . to make sure that there were no injured or suffering animals.” Officer Quiles waited to enter the home until Officers McGrath and Miller arrived “because we knew that there were several dogs within the residence. We didn’t know if there would be more. [Officer Miller is] better trained . . . to handle it.” They were inside the home for less than fifteen minutes, they did not take any pictures, nor did they search for or seize anything. Once they “established that the residence was not occupied, [they] left, secured it, and notified supervisors to contact the detective bureau.” Detectives were able to obtain a search warrant for the home and subsequently obtained an arrest warrant for the defendant.

Detective Dalling processed the defendant when she turned herself in on the arrest warrant. She read the defendant her *Miranda* rights, the defendant acknowledged that she understood them and signed a “notice of rights” that identifies the rights and confirms that “I have been advised of my rights.” Detective Dalling testified that the defendant looked tired and was crying at times but that she did not appear to be intoxicated by alcohol or drugs. Besides asking the defendant “basic standard prisoner questioning [about] demographics,” Detective Dalling did not question the defendant, but the defendant made statements to her. Detective Dalling testified that “[the defendant] stated something to the effect of, I don’t want to say anything that can be used against me, but I can’t believe I did this.” Detective Dalling recalled that “[s]he said that she was a horrible person. She can’t believe that she did this. She asked me a couple of questions about whether I thought she would go to jail. She asked me if I thought she’d ever be able to own dogs again.”

At the conclusion of the hearing, the court orally denied the defendant's motion. It found the testimony of the landlord and the officers credible and stated that the officers' testimony that they entered the home "because . . . there was a clear smell of rotten flesh from within" was "sincere." The court also found that the officers "were in[side the home] for less than fifteen minutes," that no evidence was seized, no pictures were taken and no field tests of any items were performed during that time. It concluded that "the search [was] lawful . . . ."

With respect to the defendant's statements, the court recounted that defense counsel had "solely argued" that the search was unlawful and that, because of that, the defendant's statements should "be suppressed as well." It found that, "[s]ince I find that the search is lawful, I also find that the statement is . . . admissible." The court also found that there had been a "proper advisement of rights in a custodial situation and that the defendant was advised and gave those statements anyway. I don't have to go into whether or not . . . the statements were in response to any of the questions, but . . . it certainly seems that these were almost volunteered."[20]

We begin by setting forth our standard of review of a trial court's findings and conclusions in connection with a motion to suppress. "As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses

---

[20] The court previously had stated that "the statements made by the defendant, I'm not quite sure, were in response to any particular questions the officer was asking and I find the statements are admissible."

is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision." (Internal quotation marks omitted.) *State* v. *Sayles*, 202 Conn. App. 736, 745–46, 246 A.3d 1010 (2021), aff'd, 348 Conn. 669, 310 A.3d 929 (2024). Moreover, "[i]t is by now well settled that, in order to determine whether the defendant's constitutional rights have been infringed, [w]e review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress." (Internal quotation marks omitted.) *State* v. *Griffin*, 339 Conn. 631, 687 n.28, 262 A.3d 44 (2021), cert. denied,    U.S.   , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).

We now address the defendant's two challenges to the court's denial of her motion to suppress.

A

The defendant first argues that the court improperly determined that the warrantless entry into her residence by the police on November 14, 2018, was supported by the emergency aid doctrine. She avers that the court's legal conclusions were not logically and legally correct because "there was no evidence of any emergency" when the police entered her residence and "whatever emergency may have once existed had passed." Although she acknowledges that the court found that the officers and the landlord testified credibly, she argues that crediting their testimony did "not produce any valid reasons . . . to believe [that] an emergency existed . . . ." As such, she claims that the

search violated her fourth amendment rights under the United States constitution.[21] The state responds that the "facts found by the trial court support the . . . conclusion that a reasonable officer would have believed that an emergency may have existed inside the defendant's home" and that, consequently, the warrantless entry was justified under the emergency aid doctrine. We agree with the state.

The fourth amendment to the United States constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. "[A] search conducted without a warrant issued upon probable cause is *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Emphasis in original; internal quotation marks omitted.) *State* v. *Blades*, 225 Conn. 609, 617, 626 A.2d 273 (1993). The emergency aid doctrine is one such exception. *State* v. *Curet*, 346 Conn. 306, 321, 289 A.3d 176 (2023).

"[T]he emergency [aid] exception to the warrant requirement allows [the] police to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury. . . . The need to protect or preserve life or [to] avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. . . . As a result, the

---

[21] Although the defendant cites article first, § 7, of the constitution of Connecticut in her brief, she has abandoned any separate state claim under our state constitution by failing to include a separate state constitutional analysis. See *State* v. *Ebron*, 219 Conn. App. 228, 247 n.8, 295 A.3d 112, cert. denied, 347 Conn. 902, 296 A.3d 840 (2023).

use of the emergency [aid] doctrine evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence. . . . Nevertheless, the emergency [aid] doctrine does not give the state an unrestricted invitation to enter the home. [G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Citation omitted; internal quotation marks omitted.) Id., 321–22; see also *State* v. *DeMarco*, 311 Conn. 510, 535, 88 A.3d 491 (2014) (stating that "test for the application of the [emergency aid] doctrine is objective . . . and looks to the totality of the circumstances").

The "emergency aid doctrine has its roots in the police's caretaking function, as opposed to its law enforcement function . . . ." (Internal quotation marks omitted.) *State* v. *Curet*, supra, 346 Conn. 323–24. "The extent of the search is limited, involving a prompt warrantless search of the area . . . [that] is strictly circumscribed by the emergency which serves to justify it . . . ." (Internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 618. It is the state's burden to demonstrate that a warrantless entry falls within the emergency aid doctrine exception. *State* v. *Curet*, supra, 322–23.

"[I]n reviewing a trial court's ruling on the emergency [aid] doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered [the home]." (Internal quotation marks omitted.) *State* v. *DeMarco*, supra, 311 Conn. 518–19. In doing so, "[w]e must defer to the trier of fact's assessment of the credibility of the witnesses . . . . " (Internal quotation marks omitted.) Id., 520.

Significantly, the court credited the testimony of the landlord and the officers who entered the home. Each officer testified that he was concerned that there might be a person and/or animal in need of immediate assistance inside.[22] See id. Moreover, their shared concerns about there being an emergency inside the home were objectively reasonable given the circumstances.

In addition to the smell of rotting flesh coming from the home, there was evidence that the defendant's whereabouts was unknown and that, although she had been living in the home and communicating with the landlord a few days before November 14, 2018, she had stopped responding. Moreover, photographs of the

---

[22] We are not aware of any Connecticut case that has applied the emergency aid doctrine to animal life. Although we need not decide whether the doctrine extends to animals in this case given the evidence that the police officers were concerned about both human and animal life when they entered the home, we note that courts in other jurisdictions have done so. See, e.g., *Commonwealth* v. *Duncan*, 467 Mass. 746, 752, 7 N.E.3d 469 (stating that "permitting warrantless searches to protect nonhuman animal life fits coherently within the existing emergency aid exception to the warrant requirement"), cert. denied, 574 U.S. 891, 135 S. Ct. 224, 190 L. Ed. 2d 170 (2014).

home's exterior depict unclaimed packages and a mailbox overflowing with uncollected, unopened mail. These factors, coupled with the evidence that the landlord had seen drugs and drug paraphernalia inside the home, support a reasonable belief that the defendant, herself, may have been inside and in need of assistance. See id., 540 ("putrid, overwhelming odor" in connection with other facts, including mail that was "piling up," justified warrantless entry into home under emergency aid doctrine). Moreover, the fact that the door was open on November 14, 2018, when the landlord arrived suggests that someone other than the defendant could have entered the home, was inside and needed assistance.

The defendant claims that the fact that there is no evidence that the landlord "mentioned any signs that anyone else, or any other animal, was in the [defendant's] home or in any sort of danger" should have deterred the police from entry and argues that "[a]ll signs available pointed to a static situation where whatever emergency may have existed in the past was no longer active by the time the police arrived . . . ."

"The reasonable belief standard is a less exacting standard than probable cause . . . and must be applied by reference to the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether the officers would have been derelict in their duty had they acted otherwise." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Curet*, supra, 346 Conn. 330–31. When Officer Quiles met with the landlord, she was distressed and visibly upset after finding several dead dogs and extensive damage to the home. Given the circumstances they encountered, it would not have been reasonable for the officers to believe that no emergency existed

simply because the landlord, a lay person in a distressed state, did not "mention any signs" that there was some person or animal who needed assistance.

Also, the landlord had alerted the police officers about several dead dogs inside the home. As Officer Miller testified, this indicates that "something is wrong, [and that] you have to look at what else is wrong . . . ." The knowledge that some dogs were already dead inside does not foreclose the possibility that there may have been other living dogs or their human caretakers inside the home, as the defendant suggests. See *Tamborino* v. *Superior Court*, 41 Cal. 3d 919, 921–23, 719 P.2d 242, 226 Cal. Rptr. 868 (1986) (officer responding to robbery at which injury was reported could, upon finding one injured person, look elsewhere in apartment to determine presence of other victims). Under the totality of the circumstances that confronted the officers on November 14, 2018, it was objectively reasonable for them to believe that an emergency existed when they entered the home and the court properly concluded that their warrantless entry was lawful under the emergency aid doctrine.

B

The defendant next argues that the court should not have admitted into evidence statements that she made to Detective Dalling because (1) they "were not the result of a knowing and intelligent waiver of her *Miranda* rights" and (2) because they were not voluntary. In response, the state contends that (1) because the defendant has raised the waiver argument for the first time on appeal, it is not properly preserved, and (2) the court properly concluded that the defendant's statements to Detective Dalling were made voluntarily and not in response to an interrogation or questioning. We agree with the state.

1

First, the defendant argues that she preserved her claim that she did not knowingly or intelligently waive her *Miranda* rights because she "moved in limine to suppress" her statements and that, "despite clear evidence that [the defendant] . . . who [Detective] Dalling testified had just been released from a drug rehab . . . had not made a knowing waiver of her right to remain silent," the court denied her motion. "It is well known that this court is not bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . [It must] alert the trial court to the specific deficiency now claimed on appeal." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Roberts*, 224 Conn. App. 471, 490, A.3d (2024). The defendant argued in her motion to suppress that she had not been informed of her *Miranda* rights, not that she failed to knowingly and intelligently waive them. Defense counsel also did not argue at the conclusion of the suppression hearing that she failed to knowingly and intelligently waive her *Miranda* rights. Rather, counsel argued at that time that the court should suppress her statements because the searches that led to the defendant's arrest were illegal. As such, the court was not apprised of the claim she has raised on appeal and did not decide it. This claim is not preserved. See *State* v. *Hampton*, 293 Conn. 435, 443–44, 988 A.2d 167 (2009) (motion to suppress that did not articulate basis for constitutional challenge defendant raised on appeal did not preserve claim).

Furthermore, the defendant did not request that, in the event we conclude this claim is unpreserved, we review it under the well settled standard set forth in

*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781,120 A.3d 1188 (2015). Even so, our Supreme Court has stated that, to obtain *Golding* review, "a defendant need only raise that claim in [her] main brief, wherein [she] must present a record that is [adequate] for review and affirmatively [demonstrate] that [her] claim is indeed a violation of a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 755, 91 A.3d 862 (2014). Here, however, the defendant has not presented us with a record that is adequate to review her unpreserved waiver claim.

"To be valid, a waiver [of a defendant's *Miranda* rights] must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived [her] *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case." (Internal quotation marks omitted.) *State* v. *Stephenson*, 99 Conn. App. 591, 599, 915 A.2d 327, cert. denied, 282 Conn. 903, 919 A.2d 1037 (2007). The defendant argues for the first time on appeal that "*despite clear evidence* that [she]— who . . . had just been released from a drug rehab— had not made a knowing waiver of her right to remain silent, [the court] denied" her motion to suppress the statements she made to Detective Dalling. (Emphasis added.) She argues that the "record is replete with evidence that [the defendant] was highly emotional, confused about her rights and how to act upon them, and under the influence of intoxicants that were still impairing her due to her recent discharge from rehab."[23]

---

[23] Contrary to the defendant's argument, Detective Dalling testified that the defendant did not appear to be under the influence of alcohol or drugs and the court credited that testimony.

Further, she states that she "even told [Detective] Dal-ling, prior to making any statements, that she did not 'want to say anything that might be used against her,' " which she argues indicates "both an attempt to invoke her rights and a clear misunderstanding of the contours of the rights [Detective] Dalling had advised her of and how to act upon them."

Because the defendant did not make these arguments to the trial court, however, it made no findings regarding waiver. The court found only that the defendant had been *properly advised* of her *Miranda* rights and that she gave the statements anyway. The court credited Detective Dalling's testimony, and it had no reason to further probe or endeavor to reconcile her testimony that the defendant acknowledged that she understood her rights with her testimony that the defendant was crying and emotional to make the factual determination as to whether that acknowledgment was knowing and voluntary. Nor did the court further probe Detective Dalling's testimony to learn more about the circum-stances surrounding the defendant's statement that she did not "want to say anything that might be used against her." Although the defendant argues that this statement indicates "both an attempt to invoke her rights and a clear misunderstanding of [their] contours," it could just as easily mean she understood her rights and made the statements anyway. These are questions of fact that we, as a reviewing court, cannot resolve.

For any *Golding* claim, "[i]t is incumbent upon the [defendant] to take the necessary steps to sustain [her] burden of providing an adequate record for appellate review. . . . Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the nec-essary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative."

(Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). "[W]e will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." *State* v. *Golding*, supra, 213 Conn. 240. The defendant has not presented us with an adequate record to review her claim that the statements she sought to have suppressed "were not the result of a knowing and intelligent waiver of her *Miranda* rights," and we will not review it.

2

We turn now to the defendant's argument that her statements to Detective Dalling were not voluntary and should not have been admitted because "[d]espite . . . [her] obvious signs of confusion and impairment [while she was in custody], [Detective] Dalling continued to engage [the defendant]," on the one hand, and because the defendant "express[ed] a clear desire not to waive her right against self-incrimination but [Detective] Dalling failed to heed [her] wishes," on the other. In other words, she claims that Detective Dalling improperly coerced her into saying that she was a "horrible person" and admitting she "[could not] believe that she did this."

The following legal principles guide our analysis. "Irrespective of *Miranda*, and the fifth amendment itself . . . any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an

essentially free and unconstrained choice by its maker? If it is, if [she] has willed to confess, it may be used against [her]. If it is not, if [her] will has been overborne and [her] capacity for self-determination critically impaired, the use of [her] confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; [her] lack of education; [her] intelligence; the lack of any advice as to [her] constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the due process clause of the fourteenth amendment, however, in order for a confession to be deemed involuntary and thus inadmissible at trial, there must be police conduct, or official coercion, causally related to the confession . . . . In other words, there must be an essential link between [the] coercive activity of the [s]tate, on the one hand, and a resulting confession by a defendant, on the other . . . .” (Citations omitted; internal quotation marks omitted.) *State* v. *Christopher S.*, 338 Conn. 255, 280–81, 257 A.3d 912 (2021); see also *State* v. *Griffin*, supra, 339 Conn. 670 (“the totality of the circumstances test [for voluntariness] depend[s] [on] a weighing of the circumstances of pressure against the power of resistance of the person confessing” (internal quotation marks omitted)).

“[As for the scope of our review] we note the established rule that [t]he trial court’s findings as to the circumstances surrounding the defendant’s interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . [A]lthough we give deference to the trial court concerning these subsidiary factual determinations,

such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . [A]pplying the proper scope of review to the ultimate issue of voluntariness requires us . . . to conduct a plenary review of the record in order to make an independent determination of voluntariness." (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 322, 96 A.3d 1199 (2014).

Our scrupulous examination of the record, the trial court's factual findings and its credibility determinations to which we defer, lead us to conclude that the statements the defendant made to Detective Dalling were voluntary. Detective Dalling testified that the only questions she asked the defendant after she voluntarily turned herself in were basic demographic questions and that, after she advised the defendant of her *Miranda* rights, the defendant "started making comments" and asking Detective Dalling questions about whether she might go to jail or be permitted to own dogs in the future. In other words, the defendant initiated conversation of her own accord and made her statements within that context. Detective Dalling further testified that, although the defendant looked tired and was crying at times, she did not appear to be intoxicated by alcohol or drugs.

The court credited Detective Dalling's testimony, which was the only testimony about the circumstances surrounding the defendant's statements. "Questions of whether to believe or disbelieve a competent witness are beyond our review. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation

of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *DeMarco*, supra, 311 Conn. 520. We thus defer to the trial court's credibility determination and conclude that its derivative findings were not clearly erroneous. There is no evidence of any coercive conduct by Detective Dalling, let alone coercive conduct that could be said to have prompted the defendant's statements. See *State* v. *Christopher S.*, supra, 338 Conn. 280–81. The defendant cannot prevail on her claim that the trial court improperly denied the motion to suppress her statements as involuntarily made.

## III

The defendant's final claim is that her sentence violated her right to due process under both the fifth amendment to the United States constitution and article first, § 8, of the Connecticut constitution because the court relied on conduct related to the cruelty to animal charges of which she was acquitted. Although the defendant acknowledges that it is "constitutionally permissible to consider acquitted conduct at sentencing under certain circumstances," she cites to the United States Supreme Court's decision in *United States* v. *Watts*, 519 U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997), to argue that the sentencing court improperly considered her conduct related to the deaths of the dogs here without *explicitly* finding that her conduct had been proven by a preponderance of the evidence.[24] In

---

[24] In her appellate brief, the defendant argues more broadly that "it was patently improper for the trial court to consider such acquitted conduct at sentencing without finding it proven by a preponderance of the evidence" and that the court "did not find that such evidence was proven by any standard, let alone a preponderance of the evidence." During oral argument before this court, however, the defendant's counsel argued that, "in the case of acquitted conduct [that] standard should be explicit and it should be stated," and he has invited this court to articulate a "bright-line rule" to that effect.

response, the state argues that the court properly considered the evidence related to the acquitted charges. Specifically, the state asserts that this case is controlled by our Supreme Court's decision in *State* v. *Langston*, 346 Conn. 605, 641, 294 A.3d 1002 (2023), cert. denied,    U.S.    , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024), which held that a sentencing judge may properly consider conduct related to a charge of which a defendant was acquitted when it sentences the defendant on other charges, as long as the underlying conduct and evidence considered has a "minimal indicium of reliability" and the sentence imposed is within the permissible statutory range for the conviction.[25] The state argues that, as in *Langston*, the trial court here properly considered the conduct evidence underlying the acquitted charges.[26]

The following additional facts and procedural history are necessary for our resolution of this claim. The court sentenced the defendant on May 4, 2022. At the beginning of that hearing, defense counsel objected to the court's consideration of information contained in the presentence investigation report (PSI) "that relates to the alleged death of the dogs or that relates to the dogs" when sentencing the defendant because that information pertained to "allegations that were never sufficiently proven." The prosecutor responded that it would be impossible to "separate the fact that the dogs were

[25] The maximum sentence of imprisonment for criminal damage of a landlord's property, a class D felony, is five years; General Statutes § 53a-35a (8); and thus, the five year sentence the court imposed was within the permissible statutory range for the conviction. The defendant does not challenge this conclusion on appeal.

[26] Our Supreme Court decided *Langston* after the defendant filed her opening brief in this appeal and, thus, she did not address the decision there. The state filed its brief after *Langston* was decided and addressed the decision at length in that brief. The defendant did not file a reply brief, and, at oral argument before this court, her appellate counsel maintained that *Watts* supports her position.

in the house when they died and caused the damage to the landlord's property . . . [b]ecause they're the mechanism of the damage."

The court stated that it could not consider the convicted charge of criminal damage of a landlord's property "without also considering the crimes . . . [of] which the defendant was acquitted . . . ." The court stated: "The name of the case on point is [*State* v. *Huey*, 199 Conn. 121, 505 A.2d 1242 (1986)] . . . a 1986 Connecticut Supreme Court case. There are many cases that follow along with this.[27] This is not the first case in which somebody was acquitted of a crime and sentencing transpired thereafter. [*Huey*] indicated that the factors that could be considered by a court in sentencing include responsible unsworn out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstances. Evidence of crimes to which the defendant was indicted but neither tried nor convicted, *evidence bearing on charges for which the defendant was acquitted.* Evidence of counts of [the] indictment that [have] been dismissed by the government and the defendant's demeanor and the lack of veracity and remorse that [was observed] by the court during the course of the trial on the merits. Those are suggestions that our [Supreme] Court has indicated that a sentencing judge can follow.

"I will tell the parties this. The PSI remains the same. *The court is sentencing the defendant on the crime she was convicted of and not on the other ten counts* . . . . [B]ut in this case as [the prosecutor] has [indicated] there is some interplay. We did hear from the landlord and rightfully so, her testimony on sentencing should not be restricted . . . . And we will hear from Attorney

---

[27] The court also specifically referenced *State* v. *Anderson*, 212 Conn. 31, 561 A.2d 897 (1989), which cited to *Huey*.

Bernhard and I do not want to limit him in what information he provides to the court."[28] (Emphasis added; footnote added.)

The prosecutor described the case as "unique because the mechanism of the damage caused was done by way of [the] animals." She stated that the landlord had lost the home and that her reputation had been "dragged through the mud" as a result of the defendant's actions, and that the defendant had shown no remorse. She recounted that, "after being found not guilty of the animal cruelty charges, [the defendant] went on social media and recorded videos prompting the public with her apparent victory. She may have been found not guilty of those charges but . . . she still stands before, Your Honor, convicted of a felony."

Defense counsel explained that the defendant had no prior criminal record and that she had been a productive citizen until her addiction to drugs. Finally, the defendant, exercising her right of allocution, discussed her addiction, apologized, and acknowledged that her "path forward does not include working with animals."

Prior to the imposition of sentence, the court commented: "[T]here are many things a court can take into consideration when issuing a sentence and they include such thing[s] as [the] relevant background of the defendant. The impact on the victim of course, and the defendant's attitude toward the offense." It specified that it "can certainly look at [the defendant's] actions after the verdict" and that, among other things, it had seen "the defendant's behavior right [afterward]. I saw her bragging about how she was found innocent. I thought I was pretty clear that she was not found innocent. She was found not guilty." It further stated that "*I do not take into consideration . . . the charges of* [*which*]

---

[28] Attorney Kenneth G. Bernhard is an animal advocate who addressed the court over the defendant's objection.

*the defendant was acquitted* . . . . However, I do indi-
cate that the death of those five innocent dogs do impact
me on this. Because it was their damage [so to] speak.
And when I say their damage, it makes it seem like I'm
blaming them but the fact that those dogs who died
were left to rot. Were left to decay. Were left to diminish
in the cages in which an animal should be able to find
some comfort, it's horrific.

"So, I have reviewed the PSI. I have reviewed the
restitution study. I take into account the totality of all
circumstances *including the facts and circumstances
related to the offense.* The relevant background of the
defendant, including her age, family, history, education,
employment, relationships, and the fact that she has
no criminal record." (Emphasis added.) The court
imposed a total effective sentence of five years of
imprisonment, execution suspended after fifteen
months, and probation, with special conditions,[29] for a
period of five years.

We review this claim with considerable deference to
the trial court's exercise of discretion. "A sentencing
judge has very broad discretion in imposing any sen-
tence within the statutory limits and in exercising that
discretion he may and should consider matters that
would not be admissible at trial. . . . Of necessity
much of the information garnered by the probation
officer will be hearsay. . . . To arrive at a just sen-
tence, a sentencing judge may consider information that
would be inadmissible for the purpose of determining
guilt . . . evidence of crimes for which the defendant
was indicted but neither tried nor convicted . . . evi-
dence bearing on charges for which the defendant was

---

[29] The special conditions included that the defendant is "not to work or
operate for any organization that involves animals" and that she is "to
complete the Connecticut Animal Cruelty Prevention and Education Pro-
gram."

acquitted . . . and evidence of counts of an indictment which has been dismissed by the government. . . .

"Generally, due process does not require that information considered by the trial judge prior to sentencing meet the same high procedural standard as evidence introduced at trial. Rather, judges may consider a wide variety of information. . . . Consistent with due process the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance. . . . It is a fundamental sentencing principle that a sentencing judge may appropriately conduct an inquiry broad in scope, and largely unlimited either as to the kind of information he may consider or the source from which it may come. . . . The trial court's discretion, however, is not completely unfettered. As a matter of due process, information may be considered as a basis for a sentence only if it has some minimal indicium of reliability. . . . As long as the sentencing judge has a reasonable, persuasive basis for relying on the information which he uses to fashion his ultimate sentence, an appellate court should not interfere with his discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Huey*, supra, 199 Conn. 126–27. Moreover, with respect to a court's consideration of evidence related to acquitted conduct, "due process is generally satisfied when the conduct has been established by a preponderance of the evidence." *State* v. *Langston*, supra, 346 Conn. 622, citing *United States* v. *Watts*, supra, 519 U.S. 156.

In the present case, the defendant claims that, when fashioning her sentence, the court abused its discretion by relying on evidence relating to the animal cruelty charges of which she was acquitted. She argues that the court's failure to explicitly find that her conduct related to the deaths of the dogs had been proven by a preponderance of the evidence violated her right to

due process under the federal and state constitutions.[30] Under our Supreme Court's recent decision in *State* v. *Langston*, supra, 346 Conn. 605, this argument fails.

In *Langston*, the defendant claimed that a sentencing court's consideration of the conduct underlying the charge of which he was acquitted violated his federal and state constitutional rights to due process under the fourteenth amendment to the United States constitution and under article first, § 8, of our state constitution. Id., 609. There, the defendant had been charged with assault in the first degree, criminal possession of a firearm, and robbery in the first degree following his arrest in connection with an armed robbery and shooting. He was convicted, after a jury trial, of all but the assault charge. Prior to sentencing the defendant, however, and in addition to reviewing the facts surrounding the charges of which the defendant was convicted, the sentencing court commented at length, and in great detail, regarding the conduct related to the acquitted charge of assault. In doing so, it found that "[t]he evidence was telling and the witnesses credible." Id., 610–11.

Following a comprehensive analysis of the principles governing the constitutionality of sentencing practices in both the federal and state courts, including the "long line of both federal and state precedent [that] has allowed significant latitude for what judges may consider during sentencing and has permitted sentencing courts to consider a wide range of conduct, including conduct related to acquitted charges"; id., 609; our Supreme Court held that a sentencing judge may properly consider conduct related to a charge of which a

---

[30] The defendant did not separately brief her state constitutional claim and predicates her argument on "the constitutional minimum established by the United States Supreme Court." We therefore deem her state constitutional claim abandoned. See *State* v. *Ebron*, 219 Conn. App. 228, 247 n.8, 295 A.3d 112, cert. denied, 347 Conn. 902, 296 A.3d 840 (2023).

defendant was acquitted when it sentences the defendant on other charges, as long as the underlying conduct and evidence has a " 'minimal indicium of reliability' " and the sentence imposed is within the permissible statutory range for the conviction. Id., 641. The court further concluded that, because the sentencing court's consideration of the conduct underlying the acquitted assault charge and the sentences it imposed satisfied these requirements, the court did not violate the defendant's constitutional rights. Id.

In reaching these conclusions, the court followed the holdings in *Watts*, and its own decision in *Huey*, and it declined to exercise its supervisory authority to impose a rule prohibiting the consideration of acquitted conduct at sentencing. In *Watts*, the United States Supreme Court held that a "verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States* v. *Watts*, supra, 519 U.S. 157. The court explained: "[A]n acquittal is not a finding of any fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt. Without specific jury findings, no one can logically or realistically draw any factual finding inferences . . . . Thus . . . the jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty." (Citations omitted; internal quotation marks omitted.) Id., 155; see also *State* v. *Langston*, supra, 346 Conn. 617, citing *United States* v. *Watts*, supra, 155–157. In *Huey*, our Supreme Court held that a sentencing court has very broad discretion to consider a wide variety of information as a basis for a sentence, provided that the information "has some minimal indicium of reliability." *State* v. *Huey*, supra, 199 Conn. 127. The court in *Langston* explained that "the rationale supporting *Watts* and

*Huey* extends to a sentencing court's consideration of acquitted conduct, so long as it meets the requisite standard." *State* v. *Langston*, supra, 622.

Most notably, our Supreme Court in *Langston* concluded that the sentencing court did not violate the defendant's right to due process when it considered the conduct underlying the assault charge for which the defendant had been acquitted, even though the sentencing judge did not "explicitly reference the quantum of evidence" when doing so. Id., 621. It explained: "In the present case, the sentencing court considered the testimony and evidence presented by witnesses at a trial over which it presided. It had sufficient opportunity to observe and judge the credibility of such witnesses, and their sworn testimony is exactly the kind of minimally credible evidence that we anticipate sentencing judges will rely on. In fact, the sentencing judge specifically explained that he found that [t]he evidence was telling and the witnesses [were] credible" (internal quotation marks omitted); id.; and the court determined that the judge's "findings as to the sufficiency of the evidence he relied on was implicit in his explanation." Id.

The same is true in this case. As in *Langston*, the court did not explicitly state when sentencing the defendant that it found the defendant's conduct with respect to the deaths of the dogs had been proven by a preponderance of the evidence. It did, however, expressly consider the defendant's "actions after the verdict" and her "bragging" on social media about how she was found innocent. It responded to that by emphasizing that the defendant "was not found innocent. She was found not guilty." Also, as part of the special conditions the court imposed at sentencing with respect to the defendant's probation, the court ordered that she was "not to work or operate for any organization that involves animals"

and that she was "to complete the Connecticut Animal Cruelty Prevention and Education Program."

It is implicit from these probation orders and its other observations that, even though the court had not found that the evidence proved beyond a reasonable doubt that the defendant was guilty of violating § 53-247 (a) and (b) when it acquitted her of those charges, it did find that the defendant's conduct with respect to the deaths of the dogs had been proven at least by a preponderance of the evidence. See *State* v. *Langston*, supra, 346 Conn. 617 ("an acquittal only indicates the presence of a reasonable doubt as to the defendant's guilt"). Had it not, the court's pointed emphasis on the distinction between "innocent" and "not guilty" and the special conditions it imposed regarding the defendant interacting with animals and undergoing animal cruelty training simply would not follow.[31] We therefore conclude that the court did not violate the defendant's right to due process by considering the conduct underlying the charges of which the defendant was acquitted without *explicitly* referencing the quantum of evidence by which that conduct had been proven.[32] See *State* v. *Langston*, supra, 621.

[31] We note that the court had made similar findings and observations prior to returning its verdict when it explained that "[t]here's no such finding as innocent" and that, "[i]f the state fails to prove each and every element beyond a reasonable doubt, the fact finder is obligated to come back with a verdict of not guilty." It noted that Dr. Herbert Van Kruiningen testified that he could not tell what caused the dogs to die and, with respect to whether the defendant deprived the dogs of necessary sustenance, food and water, the court stated that "[i]t doesn't matter what I think. It doesn't matter what I suspect. What matters is what the state proved beyond a reasonable doubt." As such, the court's findings were implicit from the time it returned the verdict it credited the acquitted conduct evidence even though it did not find that the defendant's guilt was established beyond a reasonable doubt.

[32] Even if it was not implicit in the court's findings and observations that it found that the defendant's acquitted conduct had been proven by a preponderance of the evidence, it remains well established that a reviewing court will not presume error where the record does not reveal what standard of proof the court has applied. Rather, we presume the court used the

Moreover, the evidence regarding the defendant's conduct underlying the acquitted charges had a " 'minimal indicium of reliability.' " Id., 622. The court had presided over both the suppression hearing and the trial where testimonial and documentary evidence regarding the defendant's conduct with respect to the deaths of the dogs had been presented. As in *Langston*, the court had sufficient opportunity to observe and judge the credibility of the witnesses and assess their sworn testimony, which is "exactly the kind of minimally credible evidence that we anticipate sentencing judges will rely on." Id., 621. In fact, the situation is even more compelling here given that the court was also the fact finder at trial and, thus, its credibility determinations and weighing of evidence informed both the returning of the verdict and the defendant's sentencing. See *In re Antonio M.*, 56 Conn. App. 534, 540, 744 A.2d 915 (2000) ("[I]n cases tried before courts, trial judges are the sole arbiters of the credibility of witnesses and it is they who determine the weight to be given specific testimony. . . . It is the quintessential function of the fact finder to reject or accept certain evidence . . . ." (Internal quotation marks omitted.)).

There was overwhelming evidence that the deceased dogs had been in the defendant's care and that they had perished two to ten months prior to being discovered in the home from which she ran a dog rescue. Much of the damage to the home, which the defendant was convicted of causing, resulted from the dogs' carcasses and the toxins that emanated as they were left to rot. In fact, many of the facts and circumstances related to the acquitted charges also bore on the convicted offense. The court's acknowledgment that the "death of those five innocent dogs do impact me on this" and its observation that it "was their damage" from being

appropriate standard in such circumstances. *State* v. *Brown*, 145 Conn. App. 174, 187 n.13, 75 A.3d 713, cert. denied, 310 Conn. 936, 79 A.3d 890 (2013).

"left to rot" reflects this. The court had a reasonable and persuasive basis for considering the evidence regarding the defendant's conduct in relation to the death of the dogs when it sentenced her for criminal damage to her landlord's property, and it did not abuse its broad discretion or violate her due process rights in doing so. See *State* v. *Huey*, supra, 199 Conn. 126–27; see also *State* v. *Langston*, supra, 346 Conn. 620 ("[t]rial judges ought not be reprimanded for acknowledging on the record the impact of information they have gained in the plea bargaining or sentencing processes unless the use of such information confounds reason and a just result" (internal quotation marks omitted)). Thus, the defendant's claims that her due process rights were violated at sentencing must fail.

The judgment is affirmed.

In this opinion the other judges concurred.